They please the court. My name is Caldwell Fletcher. I represent Appellant Douglas A. Lopez and I intend to cover the first issue, which is of course the exception to the Federal Arbitration Act that Mr. Lopez is invoking. And secondly, I wanted to discuss some of the developments in the circuits and at the Supreme Court on the transportation worker exception. Mr. Lopez's request to find him a transportation worker under the meaning of the Federal Arbitration Act essentially is a request by him to enforce the employment agreement as written. The transportation worker exception means giving legal effect to the language in the employment agreement, which includes the record on Appeal 42. It accepts claims not lawfully subject to arbitration and provides a record on Appeal 41. This agreement will be interpreted, governed, and enforced according to the FAA. What does the record show as to his job description or title or multiple job descriptions and titles? The court may recognize that that was actually disputed fact at the District Court. Mr. Lopez claimed that he was a sales and service representative in training, and the Appellee Cintas claimed that he was a route skipper, which is essentially a temporary fill-in for other drivers. I don't think it's disputed that he drove a truck and delivered goods. The District Court engaged in some discussion about whether his sales and service duties predominated over his delivery of goods, and that, of course, was not supported by evidence from Cintas. Cintas put two things into evidence, the arbitration agreement and the declaration of its general manager, who never says, as the District Court concluded, that the job duties predominate in terms of a commercial driver's license. The majority of his work was driving the route, delivering to these customers. He would acknowledge, I think, that the part of the job that he was supposed to do was delivering goods. He would acknowledge that the part of the job that he was supposed to do was delivering goods. He would acknowledge that he was supposed to do the sales and service activities that he was expected to do, but that doesn't mean he didn't deliver goods in interstate commerce, which I think is the linchpin of the test here. Can you deal with whether or not a last-mile driver is in interstate commerce under our precedent? And by precedent, Your Honor, I must—Under any rule, under any guidance. Yeah. So we cited to you in our brief two cases of Amazon last-mile drivers, Rittman and Raithka, First Circuit and Ninth Circuit, and I believe they have both been cert denied, and those were last-mile drivers. I mean, is your client a last-mile driver? That's our position, yes. Yeah. So you don't believe that we're to the contrary in this court's decision in Eastus? Mm-hmm. And I don't think that that's dispositive, because what we have there is an airline worker who's doing luggage similar to the ramp supervisor in Saxon, which has just had a cert granted. And the Supreme Court may give us some guidance on what exactly a transportation worker is, but Saxon may not be the best vehicle for that because the, again, ramp supervisor is not the same as a last-mile driver. And I think the— They might be different, but I'm wondering how the difference helps you, because the ramp supervisor in Saxon obviously worked for Southwest. The plaintiff in Eastus worked for Lufthansa. The connection to interstate commerce for, in particular, an international airline is quite easy to understand. So if that doesn't constitute an interstate, you know, a connection to interstate commerce, then how would the last-mile drive, which obviously I take your position to be you're not crossing state lines, how does that help? And this court in Eastus cited Rojas, and Rojas has never said, and Eastus doesn't say, that you have to be crossing state lines in order to be in interstate commerce. But if you are crossing state lines and it still doesn't constitute a transportation worker for purposes of the FAA, I'm having a hard time seeing how not crossing state lines would constitute an interstate. So I'm not sure that Ms. Eastus, in your case there, actually crossed state lines. In fact, the evidence I think showed in that case that she occasionally would put bags on the ramp. Maybe they came from overseas. I'm assuming so, but that doesn't mean that she was, she was found by this court not to qualify for that exemption. She certainly wasn't, but the bags were. Okay. And Mr. Lopez's evidence was that the goods that he delivered emanated from out of state. For instance, Centas is known for making uniforms with the logo of their customers on it, and those come, I think, from North or South Carolina. And there was some evidence from Lopez that the soap came from out of state, and some goods from Mexico too as well. And what I have found in preparing for this interesting argument is that probably where we're headed is going to be a two-part test, and it's set out in a Southern District of Florida District Court case that I was unable to include in our Rule 28J letter, but I would like to cite it to the court and 1226. And in that case, they looked at the First and Ninth Circuit decisions in Rittman and Rapeco, which are the last mile drivers, and Judge Altman there said that the test should be that the delivery company must be in the business of interstate transportation in East Mississippi it was, and two, the packages must still be in the stream of commerce when the driver delivers them. And here, we'd show that Centas is in the business of interstate transportation and that the packages were still in the stream of commerce when Mr. Lopez delivered them. Counsel, I haven't read that case because it's obviously not cited in the briefs. It's not. Is it, but I take it from your portrayal of it that it disagrees with our decision in Eastus? In that case, I would say it does not disagree. Well, the way I understood what you just said is that, obviously, the goods are still in interstate commerce. Yes. And the first prong, as you pointed out, would disagree with Eastus, too. So, it strikes me that, applying the standard you give us from the Southern District of Florida, Eastus comes out the other way. I think, perhaps, what I meant to say was that it distinguishes between an airline worker like Eastus or in Saxon and a delivery driver who is more in the traditional notion of in interstate commerce, just like a FELA worker or a seaman would be. How does that work, though, with the loading and unloading? You know, the Eastus opinion ends with the concession, allegedly, by the council that loading and unloading, but aren't those things still in interstate commerce if they're loaded and unloaded? I don't understand. Well, and I think what I learned from this case was that, at some points, the goods had come to rest. And it's part of the burden of proof of, in this case, the appellant, to show that the goods were in continuous movement in interstate commerce. And we do have ample Supreme Court precedent, if you look at Rittman and Raethke, that these last two years have been considered to be workers exempt from the Federal Arbitration Act. So are you asking us to wait for the Supreme Court or anything? I mean, you can if you want to, but I'm certainly not in the business of telling this court when to rule. But I will tell you that life goes on for Mr. Lopez, and I know he would probably say, go ahead and rule if you can. So I'm sorry, does that answer your question? Yes, thank you. If we were to go ahead and issue an opinion or try to decide the case, I take it you'd agree with us that we at least have to start, I realize you have other precedent, but we at least have to start with Eastus as our latest and leading authority on this question. I think so. I'm sorry. What I would request you do with Eastus is distinguish Mr. Lopez's job duties just as was done in the Rittman and Raethke opinions in the First and Ninth Circuit and determine that his work as a delivery driver for a company in interstate commerce that is delivering goods from one state to another, even though he's the last mile driver, is an important part of that interstate commerce for the purpose of defining who and what type of workers that this exception will apply to. And I guess what I'm getting at is that the Supreme Court's cert grant in Saxon, the petition poses the Seventh Circuit's decision squarely at odds with Eastus. The petition cites both the First Circuit Raethke case and the Rittman case from the Ninth, so I'm wondering if the legal rules are going to either be clarified or changed, why it wouldn't necessarily make sense to try to adjudicate the case now where we're on sand. Again, I would be fine with you waiting. I do think it's quite likely that if the grant of sociarty means that the district court opinion, which was reversed by the Seventh Circuit in Saxon, holds, that court found that the linchpin was the actual transportation of goods at one end or another of the network. And so, but I would agree that Saxon may give us some clarity with regard to this area of the law, which is fascinating, but if the court feels that it needs to rule, I also understand and I'm really not familiar with what the court's guidelines are when a potentially dispositive case has had cert granted. More times than not, we go ahead and rule, but obviously there are instances where we've waited. The reason for going ahead and ruling is that more times than it might seem logical, but whatever the Supreme Court ends up deciding goes off on another issue and the question really hasn't been answered. But again, I'm not suggesting that we have a hard and fast rule because we don't. Well, and I'm hopeful that it will. It looks like my time is just about up, but I have saved some time for rebuttal. Yes, you have. Thank you, Mr. Chairman. Mr. Bond? Please record. My name is Cool Bond. I'm the attorney, legal counsel for the appellee in this case. Cintas Corporation, which as we all have been discussing here, is the former employer of the appellant. The appellant actually was hired by Cintas to work at its facility in Houston, Texas, and at the time of his hiring, he signed an employment agreement. And in that employment agreement was an arbitration provision specifically requiring him to arbitrate basically any and all employment claims that may arise during the course and scope of his employment with Cintas. The arbitration provision broadly included not just all of Mr. Lopez's rights or claims arising out of or in any way related to his employment with Cintas, but it also specifically identified the types of claims that would be included. And that included Title VII of the Civil Rights Act of 1964 as amended and the Americans with Disabilities Act. Per his original petition that was originally filed in state court in Texas, those are the claims that he's bringing in this case. His claims are under Title VII and the Americans with Disabilities Act, the ADA. And those claims are covered by and subject to the arbitration provision, in fact, are explicitly referred to and identified as the type of claims that would be covered by the arbitration provision. There's no dispute in this case that he signed, that Mr. Lopez signed his employment agreement. He does not challenge the authenticity of his signature. He does not challenge the existence of the document. Indeed, the document is admitted into evidence. And he does not dispute that the document isn't controlling with regard to the terms and conditions of his employment. What he raises here are two arguments, basically, to try to avoid enforcement of his arbitration agreement. One, he says he's exempt from arbitration or the Federal Arbitration Act's transportation worker exemption. And then he also argues that his agreement to arbitrate is unconscionable, both procedurally and substantively under state contract law. Initially, starting with the transportation worker exemption argument, this claim fails for multiple reasons. And I invite any questions that you may have on these, including the ones that just posed to my opposing counsel. Why shouldn't we construe East as narrowly and align ourselves with the last mile driver precedent of the other circuits? I want to say, well, first of all, the last mile driver idea hasn't been accepted by all circuits. There's two in particular that have accepted it. The first and the ninth. That's exact, yes. So the question is, why should we not construe East as narrowly and align with that? Are we free to do that if we wanted to? I don't think so. Not under the precedent that's been set in East as it was reflected in Rojas and then in Brown before that. The line of cases that we have in the Fifth Circuit pretty clearly require an individual in order to be covered by the transportation worker exemption, they have to actually be engaged in the movement of interstate goods. They actually have to be part of the channel of commerce, so to speak. And under Eastus, the last mile driver wouldn't fit that. Basically, what the Ninth and First Circuits have done is basically open the floodgates to anyone that just does local deliveries now could be engaged in interstate commerce to be covered by the Federal Arbitration Act, but at the same time, they're exempt from it because now they have been covered by the idea that driving the last mile allows you just simply to be covered because you take something that's moved in interstate commerce and you make a local delivery. And that's really all that we're talking about in the Rittman case and the case in the First Circuit. All they have done, I'm sorry, but for those particular cases, what they're basically doing is saying, hey, if you make any local delivery, you're not crossing straight state lines, you're not doing anything other than moving the product that has just kind of come along in the stream of commerce and then make that final destination delivery, then that's going to be covered. The Seventh Circuit in Grubhub, the Eleventh Circuit in Hamrick, they have specifically criticized that approach, basically saying you're opening the floodgates. The exemption, as the Fifth Circuit has recognized, is supposed to be narrow, and those two circuits, the Ninth and the First, have gone the other way. They've made it much broader and going down the road, as my opposing counsel even indicates, maybe they're going to try to make it even broader than what they already have. But part of the problem here, and I think what, based on Eastus, requires us to affirm the district court's opinion, is that the emphasis isn't supposed to be on looking at, okay, where are the goods coming from, where are they going to, are they actually moving in interstate commerce? They're actually supposed to be focusing on the duties of the actual worker. The exemption applies to a class of workers who are engaged in interstate commerce. And so, if you're just simply moving something down the line, there's almost an endless stream of employees, of workers, that are going to be covered by the exemption. That's not what's allowed by Eastus, and in fact, Eastus, I think, requires us to look specifically at what the duties are. And ultimately, the problem that Mr. Lopez has in this case is that his own job description, which he puts into evidence through his own declaration, specifically identifies what he did. And he's not one of these individuals who, like the Amazon package delivery drivers in the First and Ninth Circuit, or some interstate truck driver, obviously, that has been recognized as someone that is exempt under the transportation worker exemption. The individual that we're talking about here in the class of workers in which Mr. Lopez was working, he was doing much more than simply moving some goods along. He wasn't a delivery person. He wasn't just somebody that's moving packages or goods from point A to point B. His job is much more than that, and his own declaration shows it. It specifically says that his position was a route service sales representative, typically called an SSR. And in his own declaration, describing through his job description, specifically says that SSRs manage and grow customer accounts. They drive a truck along an established route and service and sell within an existing customer base. SSRs are the face of CentOS to our customers and must work to build rapport with key decision makers, ensure quality standards, and proactively solve customer concerns. Job responsibilities also include growing our existing customer base by upselling and cross-selling additional products and services, negotiating service agreement renewals, and controlling inventory. So what we have in this situation, completely unlike the over-the-road truck drivers, the package delivery drivers that are at issue and being recognized as qualifying for the appellant, those cases are completely an opposite to the actual job duties that Mr. Lopez was performing for CentOS. He wasn't just a delivery person. As the district court specifically recognized, this was a position that he was going out providing services to customers. He was making sales to customers. He had job duties far above and beyond simply moving goods along in interstate commerce. It also points out that the district court made some assumptions in that regard about the time spent for those types of things that are not in the record. It seems like you adopted those viewpoints, so maybe you don't think it's beyond the record. Well, I don't think there's any specific information in the record specifically saying, oh, he's going to spend X amount of his day doing this or X amount of his day doing that. It is in the record he was doing just, you know, local deliveries. He was out on the highway, you know, driving hours. In fact, SSRs, they try to minimize their windshield time. They want them in front of the customers, not out on the road where they can't actually be seen or be talking to the customers. Ultimately... How do you know that? Where is that in the record? Okay. And what I just specifically said, that may not specifically be in there, but I don't have an allocation in the record of exactly what that person did as a percentage of their time on any given day. But it was still as described by his own declaration in the job description, those were the primary duties. He was to be or she was to be the face of CENTAS, and that face obviously has to be in front of the customer if that's going to be even possible. So ultimately what the district court judge was doing was simply recognizing, hey, this was a situation where it was different than these other situations where they're, you know, last mile drivers. This person wasn't just showing up, dropping it off, and leaving. Isn't the UPS person that comes to your office and drops off your packages the face of the company, and hopefully you'll give them some packages too to send out? How is that really... Completely different. Completely different. Because they don't come in and they don't sell you additional services. They say, do you have anything that we can drop off? And by the way, do you know we have a coffee machine too? They talk to you. They say hello and goodbye, I think. They're curious, I think, obviously. But they don't stop. Part of their job isn't to try to renegotiate or to renew contracts, to make additional sales, or to actually provide services on site. They show up, they pick up, they drop off. That's true with FedEx. That's true with UPS. That's why they could be eligible. Well, they want to ask you if you have any other packages that they can send for you. So that is an additional sale. Okay. Yes. But again, I would say that's still different from what I just described in his own job description about what he's doing. I think it's completely different from a FedEx driver or a UPS driver who's just simply a package driver. Same thing with these, you know, last mile delivery folks that are just basically doing the same thing. They take a product and they, you know, float on through across the stream of commerce, cross some state lines, and they're just making the final delivery. What are they selling at Centos? I'm sorry? I'm sorry. I missed that. What are they selling? They're cross-selling. There's, as reflected in the declaration of Mr. Rogers that's in the record, Centos is a rental uniform company. They operate locations around the country. They provide rental uniforms are their main bread and butter. Or they come in, they measure you, they put your workforce in a uniform, and then those uniforms are worn out. They get dirty. They come back. They bring them back to location, clean them, return them, replace things that they— So offer uniforms and clean them and spiff them up and repair any messed up buttons or whatever? Yeah. So part of the upselling and cross-selling is you get them to buy more than just the uniforms. They sell everything from shop towels to mops to bar towels, linens, all different kinds of products. I know exactly what it is now. Thank you. But ultimately what differentiates this person, the appellant, from these other cases, he's not a last mile driver. He's not showing up, dropping off the package, and then just running out to go drop off another package somewhere else. That's, again, just kind of running through the stream of commerce. He's taking stuff and he is delivering them that may have moved through the interstate commerce, because at the end of the day, when anybody delivers anything anymore, what hasn't crossed a state line? Again, part of the problem with the analysis of the First and Ninth Circuits is that, where does it end? You're going down the slippery slope that basically any delivery person is now going to be exempt. That's hardly a narrow exemption when it's supposed to be under EASTIS. That's a separate reason entirely that his job really isn't last mile driver, right? I'm sorry? There is last mile driver is not covered because of EASTIS, and then he's not really a last mile driver. So I'm just trying to, those are two separate reasons. Absolutely. Absolutely. Yes. In that regard as well, Sentos is not a transportation company. Ultimately, not only is Sentos not a freight company, a UPS, or one of these Amazon independent contractors that basically are just signing on just to go to a facility, pick up packages, and then run them around the community and drop them off. Do you have other listed reasons? You said at the beginning that several. I don't want to cut you off from being able to do the other ones. I mean, it doesn't matter. Whatever you're concerned about, I'm more than willing to address. Are those the only two reasons? Are there any more reasons that you want to address? Yes. I mean, one of the things as well, and I know in EASTIS, it specifically said we don't want a multi-factor test. Some courts have done that. The 8th Circuit in the Lentz case basically said, hey, in order to see if somebody qualifies for the exemption, here's kind of a laundry list of factors to consider. EASTIS specifically said, we're not going to do that. It overcomplicates things. You've got to actually be involved in interstate commerce or you're done. So it's a hard line, and it's not maybe as clear or maybe as helpful as it would be to kind of walk through a series of factors, but I think the implication is very clear, is that if you are doing nothing more than just taking some packages and making that final delivery to its final destination, there's got to be more than that. It's not enough. In fact, the 7th and the 11th Circuits have said exactly that. You've said several times that EASTIS says that there should be a narrow exemption. Absolutely. Now, is that correct under the FAA's approach? Should it be remedial? Should it have been remedial rather than narrow?  That's one of the issues. Yeah. Ultimately, the problem is the Supreme Court Circuit City case, which did not have a majority vote on, and it was a bit of a mess with regard to a lot of different opinions and kind of what was the actual opinion of the majority of the justices. Up until that point, the majority view in the circuits was no doubt, and this is right Now, the Rojas case, which obviously was specifically approved and kind of readopted, so to speak, by EASTIS, Rojas basically recognized that it is to be very narrow. It's not to be expansive. It's supposed to be folks that are basically like seamen and railroad workers, the two classes of workers specifically identified in the exemption. And then, obviously, it has the other one where, well, any other class of worker who is engaged in interstate commerce. So, up until that Circuit City opinion, it was pretty clear that we're not going to add a lot of people to the exemption. You've got seamen, you've got railroad workers, and if they don't really look like those folks, we're not adding anybody. Circuit City came out, and it was kind of like, well, it muddied the waters. But, ultimately, then in EASTIS, it addressed that issue and said, okay, well, that Circuit City did have on Rojas. And, ultimately, EASTIS said, none. Rojas still stands. We adopt it, and that's what we're going to move forward with. So, I don't think there's any doubt it's still a controlling precedent. I'm stuck at pass, yes. Yes. We have a narrow approach. Absolutely. Absolutely. But, it's possible the Supreme Court will, it's been asked to take this opportunity to say it shouldn't be narrow, and we've gone off the rails, so to speak. Yeah. I mean, obviously, I can't predict what the Supreme Court would do, specifically with the, now the case has totally slipped my mind, that's been granted cert. But, if you look at what the Supreme Court has done with the Federal Arbitration Act over the last several years, five years, I mean, they are adamantly enforcing arbitration agreements. Class action waivers have been approved. I mean, it's almost decision after decision. It's in favor of an expansive approach to the Federal Arbitration Act. And, if the parties have an agreement, it's generally, it's going to be enforced, or at least it seems like the court is looking for a way to enforce it. And, I think that's definitely the approach that the Supreme Court is ultimately going to take. In fact, I would expect it to rein in these decisions coming back from the first and ninth, saying, what are you doing? You're going off the rails. Let's get it back to what it was originally supposed to be. Thank you. All right. Thank you, Mr. Bond. Mr. Fletcher, you've saved some time for rebuttal. Thank you. Just a few things to follow up, Mr. Bond. I'm somewhat surprised here to hear him quoting the job description that Mr. Lopez used in his declaration of a sales and service representative, which is what he understood he was hired for, because the district court found that he was a route skipper and engaged in this unfounded discussion about whether his duties, and he did have some duties in addition to delivering goods in interstate commerce, about whether his duties predominated on the sales and service side as opposed to delivery of goods. And that's not the legal test. And I just think we're glad that this court is going to look at that issue de novo and perhaps determine, based on the record, what, in fact, is his job and what were his job duties, and if necessary, and you're unable to determine from the record what he was, of course, find that the case should be remanded and that should be developed, because we weren't able to do any discovery on that. What I will tell you is there were opposing declarations between Lopez and the general manager, and those are in the record, and that's what the court will have to go on to determine what, in fact, the job duties were. It is our position. Is there a genuine dispute of raw material fact as to how Mr. Lopez spent his typical day? I'm not talking about what it's called, what the category is, how it's characterized, or how it's legally construed. I'm just talking about what he does day after day after day. I think you could determine from his declaration that he typically drove a truck and dropped off goods to customers of Cintas, and that was his day-to-day activity. We are claiming that Mr. Lopez is a last-mile driver within the meaning of Rittman and Raithka, and I found something in Estes that may address a previous question we had about the applicability of Estes to this case, and that is, of course, Ms. Estes was dealing with luggage, and this court talked about Ms. Estes' position that she engaged in the movement of goods to support this. She broadly defined goods in two ways and defined that passengers brought goods with them. As we know, in this case, these are goods that are specifically manufactured for customers at the end of the network who are to receive those, and Mr. Lopez is part of the network that delivers those to the end customer, very different than somebody who supervises agents who take tickets and put luggage onto ramps. There was no discussion in Estes about, well, what did she do more, supervision or actual loading of a passenger's luggage? What the Estes Court determined was that the luggage was not goods. Finally, on the enforceability of the exception to the Federal Arbitration Act exception, Mr. Lopez, again, is only asking this court to enforce the agreement as written. It states that if it's not lawfully subject to arbitration or that it will be construed under the FAA, as a transportation worker, this case is not lawfully subject to arbitration under the Federal Arbitration Act. We ask that you reverse the district court, appoint a new judge, and thank you. Thank you, Mr. Fletcher. Your case is under submission.